******************************************************

The "officially released" date that appears near the beginning of each opinion is the date the opinion will be published in the Connecticut Law Journal or the date it was released as a slip opinion. The operative date for the beginning of all time periods for filing postopinion motions and petitions for certification is the "officially released" date appearing in the opinion. In no event will any such motions be accepted before the "officially released" date.

All opinions are subject to modification and technical correction prior to official publication in the Connecticut Reports and Connecticut Appellate Reports. In the event of discrepancies between the electronic version of an opinion and the print version appearing in the Connecticut Law Journal and subsequently in the Connecticut Reports or Connecticut Appellate Reports, the latest print version is to be considered authoritative.

The syllabus and procedural history accompanying the opinion as it appears on the Commission on Official Legal Publications Electronic Bulletin Board Service and in the Connecticut Law Journal and bound volumes of official reports are copyrighted by the Secretary of the State, State of Connecticut, and may not be reproduced and distributed without the express written permission of the Commission on Official Legal Publications, Judicial Branch, State of Connecticut.

******************************************************

STATE OF CONNECTICUT *v.* LAURENCE V.
PARNOFF
(AC 36567)

Keller, Prescott and West, Js.

*Argued May 19—officially released October 6, 2015*

(Appeal from Superior Court, judicial district of
Fairfield, geographical area number two, Dennis, J.)

*Norman A. Pattis*, for the appellant (defendant).

*Mitchell S. Brody*, senior assistant state's attorney,

with whom, on the brief, were *John C. Smriga*, state's attorney, and *Michael A. DeJoseph*, senior assistant state's attorney, for the appellee (state).

*Opinion*

KELLER, J. The defendant, Laurence V. Parnoff, appeals from the judgment of conviction, rendered after a jury trial, of disorderly conduct in violation of General Statutes § 53a-182 (a) (1). He claims that there was insufficient evidence to sustain the jury's verdict. We agree and, accordingly, reverse the judgment of conviction.[1]

The following facts, as a jury reasonably could have found, and procedural history are relevant here. On July 11, 2011, Kyle Lavin, a summer intern at a water utility company, was tasked with conducting routine maintenance on a fire hydrant located on the defendant's property. Lavin called David Lathlean, an employee of the water utility company, to assist him. Lathlean and Lavin arrived at the defendant's residence in separate company trucks. In addition, Lathlean and Lavin wore identification badges and bright yellow shirts with the company's name imprinted on them. They proceeded to enter the defendant's property and locate the fire hydrant, which was situated in a wooded area approximately 100 feet from the defendant's home.[2] Upon inspecting the fire hydrant, they noticed that its front cap was missing. Approximately ten to twenty feet away from the fire hydrant was an open-ended canopied shed wherein they located the fire hydrant's missing cap, which had a hose fitting welded into it. The water utility company did not permit fire hydrant caps to be removed and modified, indicating that someone had tampered with the front cap.

Shortly after Lathlean and Lavin found the missing cap, the defendant's daughter arrived at the defendant's residence. Lathlean briefly spoke with the defendant's daughter, who informed him that the property belonged to the defendant. The defendant's daughter then began heading toward the home when she encountered the defendant, who was walking up the driveway, and informed him that Lathlean and Lavin were on the property. The defendant proceeded to confront Lathlean about his presence on the property. Lathlean explained that he, along with Lavin, were employed by the water utility company and noted their discovery of the fire hydrant's compromised front cap. In response, the defendant claimed that they had no right to be on his property and stated that he would retrieve a gun and shoot them if they did not leave.[3] Lathlean then called the police. The defendant proceeded to walk around his property with a coffee can in search of worms to use as fishing bait. Lathlean followed the defendant, and the defendant continued to tell Lathlean, along with Lavin, to leave his property. In total, the defendant asked Lathlean and Lavin to leave his property at least six times.[4]

Glynn McGlynn, a police officer with the Stratford

Police Department, and another police officer arrived at the defendant's residence approximately ten minutes after Lathlean had called the police. McGlynn asked the defendant whether he had stated that he would shoot Lathlean and Lavin with a gun, which the defendant admitted to doing. McGlynn then asked the defendant to step back multiple times so he could speak with Lathlean and Lavin privately, but the defendant refused to leave the immediate area. Thereafter, McGlynn proceeded to arrest the defendant.

The defendant was charged with disorderly conduct in violation of § 53a-182 (a) (1) and criminal mischief in the fourth degree in violation of General Statutes § 53a-117a (a) (1).[5] A jury found him guilty of disorderly conduct, but not guilty of criminal mischief. The court sentenced the defendant to three months incarceration, execution suspended, followed by one year of probation with special conditions, which required him to complete an anger management program and to write an apology letter to Lathlean and Lavin. The court also imposed a fine of $500, plus court costs. This appeal followed. Additional facts will be set forth as necessary.

The defendant's claim that there was insufficient evidence to sustain the jury's verdict convicting him of disorderly conduct in violation of § 53a-182 (a) (1) is dispositive of this appeal. Specifically, he asserts that no jury reasonably could have found that his statement to Lathlean, that he would get a gun and shoot Lathlean and Lavin if they did not leave his property, constituted "fighting words," which are a category of unprotected speech under the first amendment to the federal constitution, and, consequently, that no jury reasonably could have found that he engaged in "violent, tumultuous or threatening behavior" as required under § 53a-182 (a) (1). We agree.

We begin by setting forth the relevant standard of review. "The standard of review we [ordinarily] apply to a claim of insufficient evidence is well established. In reviewing the sufficiency of the evidence to support a criminal conviction we apply a two-part test. First, we construe the evidence in the light most favorable to sustaining the verdict. Second, we determine whether upon the facts so construed and the inferences reasonably drawn therefrom the [finder of fact] reasonably could have concluded that the cumulative force of the evidence established guilt beyond a reasonable doubt. . . . In [*State* v. *DeLoreto*, 265 Conn. 145, 827 A.2d 671 (2003)], however, [our Supreme Court] explained that [t]his [c]ourt's duty is not limited to the elaboration of constitutional principles; we must also in proper cases review the evidence to make certain that those principles have been constitutionally applied. This is such a case, particularly since the question is one of alleged trespass across the line between speech unconditionally guaranteed and speech which may legitimately be

regulated. . . . In cases [in which] that line must be drawn, the rule is that we examine for ourselves the statements in issue and the circumstances under which they were made to see . . . whether they are of a character which the principles of the [f]irst [a]mendment . . . protect. . . . We must [independently examine] the whole record . . . so as to assure ourselves that the judgment does not constitute a forbidden intrusion on the field of free expression. . . . [Our Supreme Court] . . . reiterated this de novo scope of review in free speech claims in *DiMartino* v. *Richens*, 263 Conn. 639, 661–62, 822 A.2d 205 (2003) . . . . Although credibility determinations are reviewed under the clearly-erroneous standard because the trier of fact has had the opportunity to observe the demeanor of the witnesses . . . the reviewing court must examine for [itself] the statements in issue and the circumstances under which they were made to determine if they are protected by the first amendment." (Internal quotation marks omitted.) *State* v. *Carter*, 141 Conn. App. 377, 397–98, 61 A.3d 1103, cert. granted on other grounds, 308 Conn. 943, 66 A.3d 886 (2013).

General Statutes § 53a-182 provides in relevant part: "(a) A person is guilty of disorderly conduct when, with intent to cause inconvenience, annoyance or alarm, or recklessly creating a risk thereof, such person: (1) Engages in fighting or in violent, tumultuous or threatening behavior . . . ." Therefore, "the crime of disorderly conduct consists of two elements: (1) that the defendant intended to cause, or recklessly created a risk of causing, inconvenience, annoyance or alarm and (2) that he did so by engaging in fighting or in violent, tumultuous or threatening behavior . . . ." (Internal quotation marks omitted.) *State* v. *Briggs*, 94 Conn. App. 722, 726–27, 894 A.2d 1008, cert. denied, 278 Conn. 912, 899 A.2d 39 (2006).

Our Supreme Court has held that verbal statements, unaccompanied by physical violence, are considered "violent, tumultuous or threatening behavior" when they amount to "fighting words that portend physical violence." *State* v. *Szymkiewicz*, 237 Conn. 613, 620, 678 A.2d 473 (1996). In *State* v. *Indrisano*, 228 Conn. 795, 811–15, 640 A.2d 986 (1994), the court rejected a defendant's claim that § 53a-182 (a) (1) was unconstitutionally vague on its face or as applied to him. In reaching that conclusion, the court explained that § 53a-182 (a) (1) "prohibits physical fighting, and physically violent, threatening or tumultuous behavior." Id., 812. The court continued by stating that the foregoing conclusion "is consistent with the 'fighting words' limitation that must be applied when the conduct sought to be proscribed consists purely of speech. *Chaplinsky* v. *New Hampshire*, 315 U.S. 568, 573, 62 S. Ct. 766, 86 L. Ed. 1031 (1942); *State* v. *Anonymous (1978–4)*, 34 Conn. Supp. 689, 695, 389 A.2d 1270 (1978). The *Chaplinsky* doctrine permits the state to prohibit speech that has

a direct tendency to inflict injury or to cause acts of violence or a breach of the peace by the persons to whom it is directed. See *Statewide Grievance Committee* v. *Presnick*, 18 Conn. App. 316, 559 A.2d 220 (1989)." *State* v. *Indrisano*, supra, 812.

Subsequently, in *State* v. *Szymkiewicz*, supra, 237 Conn. 618, our Supreme Court addressed whether General Statutes § 53a-181 (a) (1), the statute which creates the infraction of creating a public disturbance, proscribes speech that can be characterized as "fighting words." The elements of § 53a-181 (a) (1) are identical to the elements of § 53a-182 (a) (1), except that § 53a-181 (a) (1) requires the actor to engage in "fighting or in violent, tumultuous or threatening behavior" in a public place. Id. Accordingly, the court cited its interpretation of § 53a-182 (a) (1) in *Indrisano* and stated that "we recognized [in *Indrisano*] that § 53a-182 (a) (1) could constitutionally proscribe speech that, under a given set of circumstances, could fairly be characterized as fighting words that portend imminent physical violence. Moreover, we recognized that fighting words, because they do portend imminent physical violence or are likely to prompt imminent physical retaliation, have a sufficient aspect of physicality such that they can constitute a violation of § 53a-182 (a) (1). . . . Accordingly, a fair reading of *Indrisano* indicates that speech can be proscribed not only when accompanied by actual physical conduct, but also when it can be identified as fighting words that portend physical violence.

"Consequently, we conclude that § 53a-181 (a) (1) does not require proof of actual physical contact on the part of the defendant with a victim . . . but rather that, when applied to speech, the parameters of the violent, threatening or tumultuous behavior prohibited by § 53a-181 (a) (1) are consistent with 'fighting words' . . . ." (Citation omitted.) Id., 619–20.

"The protections afforded by the First Amendment . . . are not absolute, and [the Supreme Court of the United States has] long recognized that the government may regulate certain categories of expression consistent with the [federal] Constitution. . . . The First Amendment permits restrictions upon the content of speech in a few limited areas, which are of such slight social value as a step to truth that any benefit that may be derived from them is clearly outweighed by the social interest in order and morality." (Internal quotation marks omitted.) *State* v. *Carter*, supra, 141 Conn. App. 399. "Fighting words" fall within this category of unprotected speech under the first amendment. See *Snyder* v. *Phelps*, 562 U.S. 443, 451 n.3, 131 S. Ct. 1207, 179 L. Ed. 2d 172 (2011). "Fighting words are those that are inherently inflammatory and simply by their utterance tend to incite a breach of the peace by persons to whom they are addressed. . . . Such words touch the raw

nerves of one's sense of dignity, decency, and personality and . . . therefore tend to trigger an immediate, violent reaction. . . . They are like sparks, capable of igniting individual reaction as well as setting off a group conflagration by provoking hostile reaction or inciting a riot." (Citations omitted; internal quotation marks omitted.) *Statewide Grievance Committee* v. *Presnick*, 18 Conn. App. 316, 325, 559 A.2d 220 (1989); see also *State* v. *Szymkiewicz*, supra, 237 Conn. 620 (defining "fighting words" as "speech that has a direct tendency to cause imminent acts of violence or an immediate breach of the peace" [internal quotation marks omitted]). "Such speech must be of such a nature that it is likely to provoke the average person to retaliation." (Internal quotation marks omitted.) *State* v. *Szymkiewicz*, supra, 620. To be considered "fighting words," the speech at issue need not actually cause those who hear the speech to engage in "violent, tumultuous or threatening behavior," but must have "the tendency to provoke imminent retaliation" from them. Id. Moreover, "[w]hether particular language constitutes fighting words . . . depends not only on the language but on the full factual situation of its utterance." *State* v. *Bellamy*, 4 Conn. App. 520, 529, 495 A.2d 724 (1985).

With the foregoing legal principles in mind, we conclude that the defendant's statement did not constitute "fighting words." To be considered "fighting words," the defendant's statement must have had the tendency to provoke *imminent*, retaliatory acts of violence from the average person hearing the statement. "Imminent" is defined as "ready to take place; esp: hanging threateningly over one's head . . . ." Webster's Collegiate Dictionary (11th Ed. 2003); see *State* v. *Harris*, 277 Conn. 378, 389, 890 A.2d 559 (2006) (same); *State* v. *Damone*, 148 Conn. App. 137, 170 n.15, 83 A.3d 1227 (same), cert. denied, 311 Conn. 936, 88 A.3d 550 (2014). The foregoing "imminence" component is missing in the present case for two reasons. First, there was no evidence that the defendant appeared to be carrying a gun, and thus immediately capable of the violent act he described, when he made his statement to Lathlean. Lavin, Lathlean and Beverly Doyle, another employee of the water utility company who arrived at the defendant's residence, testified that the defendant was wearing shorts but was not wearing a shirt. This fact militates against the inference that the defendant potentially was carrying a concealed weapon at the time that he made the statement at issue. Further, as both Lathlean and Lavin testified, the defendant warned them that he would leave their presence, retrieve a gun, come back and then shoot them if they did not leave his property. There was no evidence that the defendant went into his home after making the statement. Instead, he repeatedly requested that they leave his property without reference to a gun. Although the defendant once mentioned retrieving a gun to shoot Lathlean and Lavin, the fact

that he was unarmed and showed no indication of carrying a weapon lessened the likelihood that the average person would have felt provoked to respond to the defendant's statement with imminent violence. Second, the defendant stated that he would shoot Lathlean and Lavin *if* they did not leave his property, rather than warning them that he would shoot them as a result of their presence on his property or in retaliation for another act that already had been committed. The conditional nature of the defendant's statement further reduced the probability that the average person would have responded to the defendant's statement with imminent violence.[6]

Additionally, the factual circumstances surrounding the defendant's statement further militate against a conclusion that his statement constituted fighting words. The defendant was informed by his daughter that two individuals whom he had never met were on his property. After confronting them and making his statement, he merely proceeded to walk around his property searching for worms while continuing to repeatedly tell Lathlean and Lavin to leave his property. There was no evidence suggesting that he made any gestures or committed any other actions consistent with his statement.

We readily recognize that the evidence does not reflect that the defendant responded to the water utility company personnel in a civil or socially appropriate manner. Yet, on the basis of the totality of the circumstances in which the defendant's words were used, we conclude that the average person would not react to the defendant's statement with *imminent* violence. Cf. *State* v. *Szymkiewicz*, supra, 237 Conn. 615–16, 620 (defendant's speech deemed "fighting words" when, while being escorted out of store in handcuffs, defendant threatened employee and yelled expletives at employee and police officer in front of crowd of shoppers); *Statewide Grievance Committee* v. *Presnick*, supra, 18 Conn. App. 318–19, 325 (defendant's speech deemed "fighting words" when he called employee of Department of Children and Youth Services, now Department of Children and Families (department), "child molester" and referred to department as "nazi or neo-nazi organization" during pretrial conference, and generally was "shouting," "ranting" and "raving" as he followed department employees down staircase after leaving courtroom, garnering attention of onlookers).

For the foregoing reasons, we conclude there was insufficient evidence to convict the defendant of disorderly conduct in violation of § 53a-182 (a) (1). No reasonable jury could have found, on the basis of the evidence in the record, that the defendant's statement to Lathlean constituted "fighting words." Therefore, no jury reasonably could have found that the defendant

engaged in "violent, tumultuous or threatening behavior" under § 53a-182 (a) (1).

The judgment is reversed and the case is remanded with direction to render a judgment of acquittal on the charge of disorderly conduct in violation of § 53a-182 (a) (1).

In this opinion the other judges concurred.

[1] The defendant also claims that the trial court erred by providing the jury with multiple misleading jury instructions and by improperly augmenting his sentence in retaliation for his decision to exercise his right to a jury trial. However, if a defendant prevails on a sufficiency of the evidence claim, he or she is entitled to a directed judgment of acquittal rather than to a new trial. See *State* v. *Moore*, 100 Conn. App. 122, 126 n.2, 917 A.2d 567 (2007). Because we agree with the defendant's claim that there was insufficient evidence to sustain the jury's verdict, we need not reach his other claims on appeal.

[2] The water utility company had an easement running along the waterline that afforded it access to the fire hydrant.

[3] Specifically, Lathlean testified that the defendant had "said something about [Lathlean and Lavin going] in his shed and that if we—if we didn't get off his property he was going to get a gun or something like that." When asked by the prosecutor shortly thereafter what the defendant had said he was intending to do with the gun, Lathlean replied: "To shoot us."

Lavin, who was standing nearby and overheard the conversation between the defendant and Lathlean, testified that the defendant had stated the following: "[I]f you go into my shed I'm going to go into my house, get my gun and f'n kill you."

[4] Beverly Doyle, another employee of the water utility company, arrived at the defendant's residence at some point after the defendant had made the statement to Lathlean. Doyle testified that she had heard the defendant ask her, Lathlean, and Lavin to leave his property "a couple of times."

[5] The state also charged the defendant with larceny in the sixth degree in violation of General Statutes §§ 53a-119 (15) (B) and 53a-125b (a). The defendant filed a motion to dismiss, claiming that the larceny charge was filed after the relevant statute of limitations had expired. The court granted the motion.

[6] We note that Lathlean testified that he did not recall having any reaction to the defendant's statement and that it had "bounced right off [of him]." In contrast, Lavin testified that he felt "trepidation" after hearing the statement. Although we acknowledge that speech, in order to constitute "fighting words," need not actually cause those hearing it to respond with immediate violence; *State* v. *Szymkiewicz*, supra, 237 Conn. 620–21; it is telling that neither Lathlean nor Lavin reacted violently in response to the defendant's statement or testified that they had the urge to do so.